UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SALVADOR ESTRADA,

    Petitioner,

    v.

FRANCISCO JAQUEZ, Warden,

    Respondent.

No. C 09-0939 SI (pr)

**ORDER DENYING HABEAS PETITION**

## INTRODUCTION

Salvador Estrada, an inmate at Pelican Bay State Prison, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Petitioner Estrada was convicted in Napa County Superior Court of attempted voluntary manslaughter, assault with a deadly weapon, and possession of a deadly weapon. (Ex. F at 5-6.)[1]

---

[1] Citations to "Ex." are to the exhibits making up the record lodged with the court by the Attorney General.

He was acquitted of attempted murder. The jury found that Estrada personally used a deadly weapon in commission of the crimes, that he personally inflicted great bodily injury, and that he committed the crimes with the specific intent of promoting criminal conduct by gang members. The court sentenced him to the upper term of five years and six months for the attempted voluntary manslaughter, plus consecutive terms of three years for infliction of great bodily injury and ten years for the gang enhancement. His conviction and sentence were affirmed on appeal by the California Court of Appeal and the California Supreme Court denied review.

The court of appeal set out the facts:

> Francisco Hernandez lived in an apartment complex between Riverside and Cross Streets in the City of Napa. On August 3, 2004, he saw two men whom he did not recognize arguing in front of the building. He saw his neighbor Jose Gomez yell from his apartment to the men to "shut up." The two men approached Francisco [FN2. For clarity we refer to members of the Hernandez family by their first names, since several testified, and one of the expert witnesses also has the same surname.] and called him "scrap," which he testified is a derogatory term for a Sureño. Another neighbor, Hector Zendejas, came out of the building with "nunchucks" and the two men left. Francisco then saw "a bunch of guys" arguing. Zendejas was armed with the nunchucks and a "ninja sword." One of the other men had a golf club. Francisco saw Gomez being hit with the golf club and falling, after which the other men "gathered around [Gomez] and started hitting him." Francisco saw Gomez lying on the ground and bleeding from his head.
>
> Francisco told the police that he was not a Sureño, but that he has friends who are. Francisco stated that he did not wish to testify and was doing so only because he was under subpoena.
>
> Russell Davis, a police officer with the City of Napa, testified that he interviewed Francisco three days after the incident. When Davis spoke to him, Francisco was wearing a blue belt with the number "13" on the buckle, and shoes with blue laces. When Davis asked about these items, Francisco told him that "it was old, old clothing." Davis has been a member of the police department's gang task force for five years. He attends conferences between one and three times a year to learn about "different aspects of gangs, as far as investigations, injunctions, different trends that different areas of gangs may have." He testified that blue clothing and the number 13 are common Sureño symbols. He also stated that "the code of the gang, both Sureños and Norteños is not [to] testify, period. Not against a rival gang member. And not against anyone. I mean you don't testify." He also identified a photograph of a tattoo of four stars on [petitioner's co-defendant, David] Calderon's arm as being a symbol of a Norteño gang member.
>
> Francisco's mother, Maria, testified that on the evening of August 3, she was home and heard Francisco talking loudly. When she went outside, Francisco was on the stairs of the apartment building talking on a cell phone. There were two other men nearby in the apartment parking lot. Her son said something to the two

men, and one of them yelled back "Riverside 707." The man was "a small guy. He was White. He had a red cap. And a white T-shirt with red numbers on [it]." She later clarified that both men were Hispanic, but that one was darker than the other. Then Gomez and Zendejas came downstairs. Gomez was carrying "a small stick" and Zendejas was carrying nunchucks and a sword. They began arguing with the men in the parking lot and Zendejas "ran after" the two men. "[A]fter a few minutes both of them came back, but there were not two people any more. There were more than ten guys." The darker skinned of the original two men hit Gomez with a golf club. [FN3. [Petitioner's co-defendant, David] Calderon is partially African-American and has a dark complexion.] Others in the group were carrying beer bottles and sticks. After Gomez fell, "several of the men came and kicked him ... [o]n his body, on the head, everywhere." Maria "came in between because they were hitting him and he was unconscious." The man in the red cap was standing on the sidewalk holding "a big stick." "He already had hit [Gomez]. And he was on the sidewalk ... And he was coming back to hit [Gomez] again. It was when I came in. I said to him, do not hit him because he is unconscious."

Saira, Maria's daughter, testified that she was inside with her mother and heard her brother outside speaking loudly on the phone. Saira and Maria went outside and saw Francisco coming down the stairs. Two men were in the parking lot and one was "saying Riverside 707." That man was wearing a white jersey with red letters and a red hat. Maria and Francisco went inside and Saira asked the men to leave. They continued to yell "Riverside 707" "[a]nd that's when Hector [Zendejas] came down.... [Then] the two guys started running." When Saira made her report to the police, she identified the men as "two Norteños," based on "[t]he way they were talking and the way that they were dressed, ... they were saying 707 Riverside, and ... it's all about Norte, and all of that."

Ignacio Sanchez testified that on that evening he was near Giovannoni's Market when Estrada approached and asked what he was doing and if he was "walking the streets at night." Sanchez pushed Estrada away. Sanchez stated that Estrada "started getting up in my face," i.e., that he was "standing too close and kind of challenging [him] to a fight." Estrada asked Sanchez, "What's your bang?" or "Whatcha bang?" He explained that this phrase meant "what do you claim. Like what set you are from." It also meant "whether you claim Norteño or Sureño." Sanchez thought Estrada was intoxicated. He stated that Estrada hung out with both Norteños and Sureños. A few hours later, Sanchez became aware of yelling and screaming coming from the apartments where Gomez was hurt. He saw Estrada and another man running away. Estrada then returned with the original man and four others. A fight ensued. Someone asked Sanchez who was being beaten and he replied that it was "one of the Sureños" because he was wearing blue, as were the other people who had emerged from the apartment building.

Michelle O. testified. She was 16 years of age at the time of the trial. She is Zendejas's girlfriend. In August 2004, she was visiting Zendejas. On the night of August 3, she heard "two people arguing down by the street." She heard someone say something like, "Riverside, bitches, come out and stop being pussies." She woke Zendejas and the two went into the living room, where Gomez "was by the door listening." Gomez told them that he had yelled out the door, "shut up, ladies." Zendejas and Gomez ran downstairs and Michelle O. saw two men, one of whom was Estrada, running away. Less than five minutes later there were many people downstairs yelling. Zendejas and Gomez ran downstairs again. Zendejas was carrying a sword and nunchakus, which Michelle O. had given him as he left. Gomez did not have anything in his hands when he left the apartment, but Michelle O. saw that in the street he was holding a long piece of wood.

3

> Estrada was holding a bottle.
> Michelle O. identified [petitioner's co-defendant, David] Calderon as the person who hit Gomez in the head. She also identified Calderon and Estrada as two of the people who were kicking Gomez after he fell. Estrada "grabbed the board that Jose had and he hit him." Michelle O. testified that she did not know Calderon to be involved in a gang, and "knew him as a person who wasn't violent." She stated that Zendejas has the number 14 tattooed on his stomach, and that the number is associated with the Norteños, though she did not believe that the number had any significance for Zendejas "right now." She believed that the men who yelled "Riverside" were Norteños.

(Ex. F at 1-5.)

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. See 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns a conviction obtained in Napa County, which is in this district. See 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

As grounds for federal habeas relief, Estrada contends that: (1) there was insufficient evidence to support the gang enhancement; (2) the jury engaged in misconduct by considering his failure to testify; and (3) the sentencing court violated his rights by considering a prior juvenile conviction.

A. <u>Sufficiency of the Evidence on Gang Enhancement</u>

Petitioner asserts that the evidence was insufficient to support the jury's determination that his crime was gang-related, in that there was no evidence that "Riverside" was a criminal street gang.

5

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, id. at 324. The federal court determines only whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. Id. at 324.

California's Street Terrorism Enforcement and Prevention (STEP) Act imposes sentence enhancements for felonies committed "for the benefit of, at the direction of, or in association with any criminal street gang," by a defendant with "specific intent to promote, further, or assist in any criminal conduct by gang members." Cal. Penal Code § 186.22(b).

California Penal Code section 186.22(f) defines a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated [in subdivision (e) of the statute, the 'predicate offenses'] . . . and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." *Id.* at § 186.22(f).

Petitioner's claim is that there was insufficient evidence that a gang called "Riverside" met the standard set out above for a criminal street gang. As the court of appeal pointed out, that "may be correct" (Ex. F at 8-9), but it is not relevant, because there was undisputed evidence that the Norteños are a criminal street gang and that Petitioner's crimes were committed for the benefit of that gang. The court pointed to prosecution testimony:

> The prosecution's gang expert, Gary James, testified that the Norteños is a criminal street gang within the meaning of the gang enhancement statute. James testified that the Norteños in Napa County is an ongoing organization with more

6

> than three members, that the organization claims as symbols the number 14 and the color red. As Calderon correctly acknowledges, "[u]nquestionably the prosecution proved that Norteños is an ongoing organization, and that members of that organization had committed offenses listed and dated in accordance with the requirements of sec[tion] 186.22, subdivision (e)." There was also ample evidence establishing the primary activities of the Norteños. James has worked solely on gang related crime since 1993, and on gangs in Napa County since 1999. He testified that when he moved to Napa County in June 1999, there was a rivalry between Norteños and Sureños, whom he identified as two groups whose rivalry is "a problem all over the western United States." Gang rivalry, James explained, requires one to "instill fear in a rival or an enemy to be respected." He testified about the conviction of six Norteño gang members for various crimes including assault with a deadly weapon, intimidating a witness, and attempted murder with great bodily injury. He stated that "one of the primary activities of the Norteños is violent assaults." His testimony was competent to establish these facts.

(Ex. F at 7-8.)

The testimony of gang expert James was evidence from which any rational trier of fact could have found the essential elements of the gang enhancement beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319 (standard). Although Petitioner contends that "Norteño" is not the name of a gang, whether that is or is not true as a factual matter is irrelevant; there is no evidence to that effect in the record, and there is sufficient evidence in the record from which a rational jury could conclude that the Norteños is a criminal street gang. This claim is without merit.

B. <u>Hearing on Juror Misconduct</u>

Petitioner contends that the trial court should have held an evidentiary hearing on his contention that jurors committed misconduct during deliberations by referring to his failure to testify. The court of appeal set out the facts:

> Both defendants moved for a new trial based on alleged juror misconduct. [FN8. Section 1181, subdivision (3) provides that the trial court may grant a motion for a new trial "[w]hen the jury has ... been guilty of any misconduct by which a fair and due consideration of the case has been prevented."]. The trial court denied both motions. On appeal, both defendants argue that the trial court erred by not holding an evidentiary hearing on the motions, and in determining that there was no prejudice from the alleged misconduct.
>
> In support of the motions, defendants submitted an affidavit from juror No. 5. The affidavit stated: " 'During the course of the deliberation, at least nine jurors discussed the fact that the defendants did not testify, even though the judge had instructed us not to consider or discuss this. The fact that the two defendants did not testify was mentioned by jurors several times, and it was discussed for as much as 30 minutes.' "

7

In response, the prosecution submitted a second declaration from the same juror that stated, "During our deliberations the topic of the defendants' silence came up several times. I do not recall specifically what was said, but I recall each time we reminded each other that we could not consider their silence and quickly moved on to another area of discussion. [¶] Over the entire course of our deliberations I had previously estimated that those 'snippets' may have amounted to 30 minutes of discussion. But after thinking about it some more, I think that estimate is an exaggeration. [¶] I followed all of the judge's instructions, including the instruction not to let their silence affect my verdict in any way. [¶] No juror ever expressed an intention to convict either defendant because they did not testify. No juror ever expressed an intention to hold their silence against them in any way." The prosecution also submitted declarations from the other jurors that stated, more or less uniformly, that "Before trial I heard the Judge instruct the jury that the defendants might not testify and that we could not hold that against them. After all the evidence was presented, I heard the Judge instruct the jury we could not consider the Defendants' silence in any way. [¶] During deliberations the topic of their silence came up briefly. I do not recall specifically what was said, but I recall we quickly moved on to another area of discussion and prolonged conversation on this point did not occur. [¶] I followed all of the judge's instructions, including the instruction not to let their silence affect my verdict in any way."

"When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible. (See Evid.Code, § 1150, subd. (a).) If the evidence is admissible, the court must then consider whether the facts establish misconduct. [Citation.] Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial. [Citations.] A trial court has broad discretion in ruling on each of these questions and its rulings will not be disturbed absent a clear abuse of discretion." (People v. Perez (1992) 4 Cal.App.4th 893, 906, 6 Cal.Rptr.2d 141.) Evidence Code section 1150, subdivision (a) provides "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (See also In re Stankewitz (1985) 40 Cal.3d 391, 397-398, 220 Cal.Rptr. 382, 708 P.2d 1260.)

Defendants are correct that the trial court could not consider the affidavits of the remaining jurors to show the jurors' mental processes, but there is no indication that the court did so. At the hearing, the trial court stated, "there is nothing in [juror No. 5's] affidavit or any of the other affidavits, that indicates that other than mentioning it, it wasn't a discussion that wasn't cut off. They moved on. The objective facts that were here indicate that although there was mention of it, the purpose of the court's instructions is that they were not to consider it, and not to raise it as a basis for decision. It was involved, but that did ... not interfere with the decision, and the ultimate verdict of the jury in the case."

Nor was the trial court required to conduct an evidentiary hearing. "[W]hen a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations. We stress, however, that the defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be

>held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (People v. Hedgecock (1990) 51 Cal.3d 395, 415, 272 Cal.Rptr. 803, 795 P.2d 1260.) In People v. Hord (1993) 15 Cal.App.4th 711, 19 Cal.Rptr.2d 55, jurors submitted affidavits indicating that they had discussed both the fact that the defendant did not testify, and what the sentence would be. The Court of Appeal nevertheless held that the trial court did not abuse its discretion in denying the request for an evidentiary hearing "[b]ecause the truth of the material allegations was not in question." (Id. at p. 724, 19 Cal.Rptr.2d 55.) Likewise in this case, the affidavits before the court gave rise to no substantial question as to what had occurred during the course of deliberations. All jurors agreed that there was brief mention of the defendants' failure to testify and of the court's instructions not to consider the matter, and that the deliberations proceeded without further discussion of the subject. The trial court did not abuse its discretion in denying the request for an evidentiary hearing.
>
>There is no basis to conclude that the brief reference to defendants' failure to testify was prejudicial. "Although misconduct raises the presumption of prejudice, '[t]he presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm.' " (People v. Hord, supra, 15 Cal.App.4th at p. 725, 19 Cal.Rptr.2d 55.) "Where the misconduct is not 'inherently likely' to have affected the vote of any of the jurors, prejudice is not shown." (Id. at p. 727, 19 Cal.Rptr.2d 55.) In Hord the court concluded that the fact that some jurors had discussed the defendant's failure to testify was not inherently likely to have affected the verdict. "Transitory comments of wonderment and curiosity, although misconduct, are normally innocuous, particularly when a comment stands alone without any further discussion.... [¶] When comments go beyond natural curiosity and their content suggests inferences from forbidden areas, the chance of prejudice increases. For example, if a juror were to say, 'The defendant didn't testify so he is guilty,' or 'we will have to find the defendant guilty of the greatest charges to ensure he will be adequately punished,' the comments go beyond mere curiosity and lean more toward a juror's drawing inappropriate inferences from areas which are off limits. Such comments are more likely to influence that juror and other jurors." (Id. at ¶. 727-728, 19 Cal.Rptr.2d 55.)
>
>Although the original declaration of juror number 5 establishes minor misconduct, no prejudice may be inferred. While defendants' failure to testify was mentioned, the reference was brief and the jurors acknowledged the court's instruction that the matter was not to be considered. There is no evidence that there was any discussion concerning the implications of the defendants' failure to testify or that any juror indicated that the court's instruction would or should be disregarded, or that it was disregarded.

(Ex. F. at 15-18.)

In his petition, Estrada phrases this issue thus: "The trial court should have held an evidentiary hearing on the allegations of jury misconduct." (Pet. at 8.) There is no clearly established Supreme Court authority holding that it is a constitutional violation for a trial court not to hold an evidentiary hearing on a jury misconduct claim. This claim therefore cannot be

1  the basis for federal habeas relief, and is rejected for that reason.  *See* 28 U.S.C. § 2254(d).

2  Alternatively, the court notes that in the statement of facts in the petition supporting this issue Estrada makes conclusory references to the Sixth Amendment right to an impartial jury, the right to a fair trial, and his Fifth Amendment right not to testify at trial.  (Pet. at 10-11.)  None of these claims were raised on appeal.  (Ex. E at 29-32 (Appellant's Opening Brief); Ex. G (Petition for Review) at 26-28.)  The argument on direct appeal was that the trial court erred in not holding an evidentiary hearing, which in some circumstances is required by California case law.  (Ex. E at 29-32.)  That contention was rejected, discussing only California law, by the court of appeal.  (Ex. F at 14-18.)  Because Estrada did not raise in state court any federal constitutional claims as to this issue, any such claims that might be inferred from the petition would not be exhausted, and so could not be grounds for granting the petition, *see* 28 U.S.C. § 2254(b), (c); but because issues that are not exhausted can be denied, though not granted, and because the claims implied by the Statement of the Facts portion of the petition are without merit, they will be briefly addressed here.

15  First, Estrada mentions his Sixth Amendment right to trial by jury.  The only Sixth Amendment right that seems applicable on these facts is the requirement that the jury base its verdict on the evidence presented at trial.  Turner v. Louisiana, 379 U.S. 466, 472 (1965).  "Evidence not presented at trial . . . is deemed 'extrinsic.' " United States v. Navarro-Garcia, 926 F.2d 818, 821 (9th Cir.1991).  The fact that a defendant did not testify in his or her own defense is not extrinsic evidence, however.  United States v. Rodriquez, 116 F.3d 1225, 1226-27 (8th Cir.1997). "[A]lthough the jury's discussion of this issue clearly violated the trial court's instructions, what happened (or did not happen) in the courtroom was a part of the trial, not extrinsic to it. We may not inquire into a jury's deliberations concerning the evidence at trial. Belmontes v. Brown, 414 F.3d 1094, 1124 (9th Cir.2005), rev'd on other grounds, Ayers v. Belmontes, 549 U.S. 7 (U.S. Nov. 13, 2006) (No. 05-493)." Raley v. Ylst, 470 F.3d 792, 803 (9th Cir. 2006).

27  For the reasons set out in Raley, any Sixth Amendment claim Estrada may be attempting to raise is without merit.

10

Secondly, Estrada mentions "misconduct" and his right to a "fair trial." Allegations of juror misconduct are cognizable federal habeas claims to the extent a petitioner is arguing that he was denied a fair trial. Jeffries v. Blodgett, 5 F.3d 1180, 1189 (9th Cir.1993) (finding that question on habeas review is whether juror misconduct deprived defendant of his or her right to fair trial). "To obtain relief, petitioners must . . . show that the alleged error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " Id. at 1190 (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Here, the only evidence of the effect of the jurors mentioning Estrada's failure to testify is that in the jurors' affidavits, where they all agree that it had no effect at all. To the extent Estrada may be attempting to raise a fair trial/due process claim based on the juror's references to his failure to testify, and assuming for the sake of deciding this issue that there was constitutional error, the claim is without merit because he was not prejudiced.

Finally, Estrada mentions his Fifth Amendment right not to testify. "The Constitution . . . . guarantees that no adverse inferences are to be drawn from the exercise of [the Fifth Amendment right not to testify.]" Carter v. Kentucky, 450 U.S. 288, 305 (1981). Here, however, there no evidence that the jury drew any adverse inference from Estrada's failure to testify, and in fact all the evidence is to the contrary; in their affidavits, the jurors say that they were not influenced by that fact. There thus was no Fifth Amendment violation. To the extent Estrada may be attempting to raise a Fifth Amendment claim, that claim is without merit.

C.   Enhancement for Prior Juvenile Conviction

Petitioner contends that the sentencing court violated his rights by basing the sentence upon facts not tried to a jury and found by it to be true beyond a reasonable doubt.

1.   Facts

The sentencing court based its selection of the upper term for Estrada's conviction of attempted voluntary manslaughter on "the facts that Estrada 'was a ward and on juvenile probation at the time this was committed,' that 'he was involved in the start of the confrontation'

11

and that 'the victim was on the ground and being hit with a stick by the defendant when he was in that extremely vulnerable position.'" (Ex. F at 18.) These facts were neither admitted by Estrada nor found to be true by the jury.

### 2. Standard

The Sixth Amendment requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 488-90 (2000). The Supreme Court has explained that "the statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington, 542 U.S. 296, 303 (2004). Put differently, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum [the judge] may impose without any additional findings." Id. at 303-04 (emphasis supplied). In Cunningham, the Supreme Court held that the "the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum" that could be imposed, absent additional findings of fact by the jury. 549 U.S. at 288. Thus, pursuant to Apprendi and Blakely, the Sixth Amendment forbids the imposition of an upper term sentence under California's DSL unless aggravating circumstances are admitted by the defendant or proved to a jury beyond a reasonable doubt.

Under California law, the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term. Butler v. Curry, 528 F.3d 624, 642 (9th Cir. 2008); People v. Black ("Black II"), 41 Cal. 4th 799, 813 (2007); People v. Osband, 13 Cal. 4th 622, 728 (1996). That is, only one aggravating factor is necessary to set the upper term as the "statutory maximum" for Apprendi and Blakely purposes. Black II, 41 Cal. 4th at 815. While the sentencing court may have made factual findings with respect to additional aggravating circumstances, these findings, themselves, do not further raise the authorized sentence beyond the upper term. Id. "[T]he relevant question is not what the trial court would

have done, but what it legally could have done." Butler, 528 F.3d at 648 (emphasis in original); Black II, 41 Cal. 4th at 815. After validly finding one aggravating factor, a trial court legally could impose an upper term sentence. That the judge might not have imposed an upper term sentence in the absence of additional aggravating factors does not implicate the Sixth Amendment. Butler, 528 F.3d at 649.

### 3. Analysis

The result here is controlled by Kessee v. Mendoza-Powers, 574 F.3d 675 (9th Cir. 2009), which is squarely on point. That case involved a California sentencing decision in which the state court imposed the upper term on at least two grounds, that the defendant was on probation when he committed the crime and that his offenses were of "increasing seriousness." Id. at 676 & n.1. These facts had not been tried to a jury and found beyond a reasonable doubt. The appellate court there held, as did the court of appeal here (Ex. F at 18-19), that the "on probation" factor came within the "prior conviction" exception to the rule established in Apprendi and its progeny. Kessee, 574 F.3d at 676 & n.1.

The court in Kessee noted that in Butler the court had greatly limited the "prior conviction" exception to the Apprendi rule, and had held that the fact that an offense was committed while the defendant was on probation did not come within the exception. Id. at 677-78 (citing Butler, 528 F.3d at 647). The Kessee court concluded, however:

> Butler does not represent clearly established federal law 'as determined by the Supreme Court of the United States.' 28 U.S.C. § 2254(d)(1). Because the Supreme Court has not given explicit direction and because the state court's interpretation is consistent with many other court's interpretations, we cannot hold that the state court's interpretation was contrary to, or involved an unreasonable application of, Supreme Court precedent.

Id. at 679. For the same reason, the rejections of this claim by the state appellate courts in Estrada's cases were not contrary to, or an unreasonable application of, clearly-established United States Supreme Court authority, and federal habeas relief cannot be granted on this claim.

**CONCLUSION**

For the foregoing reasons, the petition is denied. The clerk shall close the file.

IT IS SO ORDERED.

DATED: April 26, 2010

     *Susan Illston*
     SUSAN ILLSTON
     United States District Judge